**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROSEMARY SIMS, Personal
Representative for the Estate of
Jamel Orlando Radcliff,
<u>Plaintiff-Appellant,</u>

v.

GREENVILLE COUNTY,
<u>Defendant-Appellee,</u>

and

PERRY EICHOR; GERALD SEALS;
ALFRED H. ZATOR, III, Lieutenant;
DONALD HAMPTON, Lieutenant; DANA
A. LEWIS; ROBERT J. FELTON;
GREENVILLE COUNTY COUNCIL; PAUL
B. WICKENSIMER; SCOTT CASE; C.

No. 99-1732

WADE CLEVELAND; RICK BLACKWELL;
BOB COOK; LOTTIE GIBSON; ALLEN
BUNK JOHNSON; MARK KINGSBURY;
STEPHEN C. SELBY; DANA SULLIVAN;
ZANTHENE NORRIS; DOZIER BROOKS;
GREENVILLE COUNTY DETENTION
CENTER; DONALD L. JEFFERS;
KIMBERLY CRENSHAW; ERIC CADE;
LANE BARKER; JOHN HUBRAK; PHILLIP
E. WRIGHT; DAVID GARRETT; DONALD
GARRETT; DONALD KENNEY; JOHNNY
MCCOMBS, JR.; EMSA; W.C.
HOFFMAN,
<u>Defendants.</u>

UNITED STATES OF AMERICA,
<u>Movant.</u>

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
Henry M. Herlong, Jr., District Judge.
(CA-97-2810-6-20)

Argued: March 1, 2000

Decided: April 14, 2000

Before LUTTIG, WILLIAMS, and MOTZ, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Fletcher N. Smith, Jr., LAW OFFICE OF FLETCHER N.
SMITH, JR., Greenville, South Carolina, for Appellant. Boyd Benja-
min Nicholson, Jr., HAYNSWORTH, MARION, MCKAY & GUE-
RARD, Greenville, South Carolina, for Appellee. **ON BRIEF:** Brent
O.E. Clinkscale, Riche T. McKnight, WOMBLE, CARLYLE, SAN-
DRIDGE & RICE, Greenville, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Rosemary Sims, the personal representative of the estate of Jamel
Orlando Radcliff, sued Greenville County in the United States District
Court for the District of South Carolina after Radcliff, a pretrial

detainee at the Greenville County Detention Center (GCDC) in Greenville, South Carolina, died following an altercation with detention officers.[1] Sims claimed that the County was liable, under 42 U.S.C.A. § 1983 (West Supp. 1999), for the alleged use of excessive force against Radcliff because, according to her, it maintained a policy of deliberately failing to train its officers in the appropriate limitations on the use of force during multiple-officer "takedowns"[2] of detainees. She also claimed that Greenville County was liable under the South Carolina Tort Claims Act (SCTCA) because, according to her, it had been grossly negligent in failing to train its detention officers in the appropriate limitations on the use of force during multiple-officer takedowns.[3] The district court granted summary judgment to Greenville County, and Sims now raises this appeal. In regard to Sims's § 1983 claims, we, like the district court, find that Sims failed to present evidence that would create a genuine issue of material fact as to whether the County maintained an unconstitutional policy concerning the use of force in multiple-officer takedown situations. We

_____

[1] Sims also asserted various claims, under both 42 U.S.C.A. § 1983 (West Supp. 1999) and state law, against the detention officers involved in the altercation and Greenville County officials Gerald Seals, Perry Eichor, and Frank Loftis. Sims does not appeal the district court's grant of summary judgment to these County officials on the claims asserted against them. Sims voluntarily dismissed some of her claims against the detention officers, and, after some of her claims against those officers survived summary judgment, ultimately entered into a settlement with the officers who were not dismissed from the action.

[2] As the term is used by the parties, a multiple-officer takedown occurs when a group of officers utilizes force to take an inmate to the ground and then applies restraints to him.

[3] In addition, Sims argued below, independent of her "failure to train" claim under 42 U.S.C.A. § 1983 (West Supp. 1999), that Greenville County maintained a custom of allowing detention officers to use excessive force in restraining inmates. Because she only cursorily raises that issue here and fails to develop her arguments on that issue, we address it summarily in footnote 8. Furthermore, although Sims also argued below that Radcliff's death was caused at least in part by Greenville County's maintenance of both a policy and custom of showing deliberate indifference to the serious medical needs of inmates, she does not appeal the district court's grant of summary judgment to the County on that issue.

also find that Sims failed to present evidence that would create a genuine issue of material fact as to whether the County was grossly negligent in its training of officers and therefore liable under the SCTCA. Thus, we affirm the district court's grant of summary judgment to Greenville County.

I.

Because this case is at the summary judgment stage, we recite the facts surrounding Mr. Radcliff's death in the light most favorable to Sims, the non-moving party.[4] See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). On August 21, 1997, Jamel Radcliff was arrested on a bench warrant for a charge of simple possession of marijuana and taken to the GCDC. After Radcliff's girlfriend went to the magistrate's office and paid the appropriate fine, the magistrate faxed a release form to the GCDC, notifying the officers there that Radcliff was to be released. The officers at the GCDC, however, discovered that Radcliff had another outstanding bench warrant for failure to pay a fine on a 1993 charge of unlawful possession of a gun.

Radcliff therefore was kept at the GCDC and, after dressing in a prison jumpsuit, waited in the intake and release area of the facility to be assigned housing. Detention officers then attempted to move Radcliff and the other inmates into holding cells in order to feed them. An altercation began when Officer Robert Felton refused to allow Radcliff the use of the telephone.

Four other officers became involved in the altercation, and, after a brief struggle, took Radcliff to the floor. More officers joined in the struggle to subdue Radcliff once he was on the floor. According to testimony provided by Radcliff's brother, Cory Radcliff, who was also a pre-trial detainee in the GCDC that day, the officers placed their knees on Radcliff's neck and back. At least one officer had a

_____

[4] Sims's complaint and brief are filled with many disputed factual allegations that are not relevant to her claims against the County. We focus only on those facts, and the inferences to which Sims is entitled therefrom, that are relevant to her claims against the County.

4

foot on Radcliff's back, and another officer kept Radcliff in a choke hold. The officers hog-tied[5] Radcliff and left him in a holding cell.

Eventually, the nursing staff of GCDC, as well as the Greenville County Emergency Medical Service, provided medical attention to Radcliff. (J.A. at 312.) Despite their efforts, Radcliff died of asphyxiation due to pressure that was placed either on his back or around his neck during the struggle with the officers. (J.A. at 312). Sims then brought the instant action. After the district court granted summary judgment to Greenville County, she filed a timely notice of appeal.

II.

We review a district court's decision to grant summary judgment de novo. See Altizer v. Deeds, 191 F.3d 540, 547 (4th Cir. 1999). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A.

Sims first argues that the district court erred in granting Greenville County summary judgment as to her claim under 42 U.S.C.A. § 1983 (West Supp. 1999) because, she contends, Greenville County maintained a policy of deliberately failing to train its officers in the appropriate limitations on the use of force during multiple-officer

_____

[5] As the district court explained in its order granting summary judgment to Greenville County, hog-tying refers to the practice of handcuffing an inmate behind the back, placing leg irons on him, and drawing the inmate's hands and feet within a few inches of each other by use of a chain between the handcuffs and leg irons. See also Price v. County of San Diego, 990 F. Supp. 1230, 1235 (S.D. Cal. 1998) (describing the hog-tying process).

takedowns of prisoners. She then attempts to link this alleged policy to her allegation that Radcliff was deprived of his constitutional right to be free from excessive force when he died as a result of pressure applied on his back or around his neck. Assuming that the facts as alleged show that Radcliff suffered such a deprivation, we start with the well-settled proposition that a municipality is liable under § 1983 only if it causes a deprivation of constitutional rights through an official policy or custom. See Monell v. Department of Social Services of New York, 436 U.S. 658, 690-91 (1978). Although the failure to implement necessary training practices can constitute an official policy for purposes of a § 1983 suit, "the inadequacy of [law enforcement officers'] training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the [officers] come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989). In other words, "the need for more or different training [must be] so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." Id. at 390. As the Supreme Court has recently admonished, "`deliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Board of County Comm'rs v. Brown, 520 U.S. 397, 410 (1997).

"Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury." Harris, 489 U.S. at 391. A plaintiff must demonstrate that the alleged injury "[w]ould . . . have been avoided had the employee been trained under a program that was not deficient in the identified respect." Id. As we have stated, "muncipal liability will attach only for those policies or customs having a specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (internal quotation marks omitted). A court must enforce these "rigorous standards of culpability and causation" so that it does not disobey Monell's holding that a municipality cannot be held liable for the actions of its employees under a theory of respondeat superior. See id. (internal quotation marks omitted). Sims has failed to present evidence that Greenville County displayed deliberate indifference to the

6

constitutional right of inmates to be free from excessive force by ignoring a need to better train its officers to handle multiple-officer takedown situations. It is undisputed that Greenville County had a use-of-force policy requiring its detention officers to use the minimum amount of force necessary when dealing with a violent or potentially violent situation. It is further undisputed that GCDC officers are trained in that policy and taught techniques for properly taking an inmate to the floor, using the least amount of force necessary, and avoiding placing a knee on the inmate's back or neck so as to prevent asphyxiation. Sims contends that the County should have specifically trained detention officers at the GCDC to deal with multiple-officer takedowns. We view this contention as merely an assertion that the County should have made its officers engage in group exercises, involving different numbers of officers confronting a single inmate, when the County trained the officers how to take an inmate to the floor and to avoid placing a knee on the back of an inmate's neck while applying full restraints. According to Sims, the County's failure to address this specific "deficiency" in the program constituted deliberate indifference to the constitutional right of Radcliff and other inmates to be free from excessive force.

Sims simply cannot support this assertion. She can point to no prior instance where an inmate died from compression asphyxiation due to pressure being applied to the back or neck during a multiple-officer takedown.[6] Sims can point to only one incident prior to Radcliff's

_____

[6] Before the district court, Sims contended that compression asphyxiation (caused by pressure to the back or neck during the multiple-officer takedown of Radcliff) or positional asphyxiation was the cause of death. Theoretically, positional asphyxiation can occur as a result of an inmate being hog-tied after he has engaged in a violent struggle that causes blood oxygen levels to decrease; the hog-tying prevents oxygen levels from rising because it impairs the process of inhaling and exhaling. See Price v. County of San Diego, 990 F. Supp. 1230, 1237 (S.D. Cal. 1998). As at least one federal court has recently noted, however, there is little or no scientific evidence that hog-tying causes positional asphyxiation. See id. at 1238 (noting that the scientist who first claimed that hog-tying causes positional asphyxiation and whose work others in the field relied upon heavily now says that hog-tying is physiologically neutral in the face of a new study that refutes his claims; concluding that "[l]ike a

7

death where an inmate was injured during the course of a multiple-officer takedown. In that instance, on February 10, 1997, detention officers applied restraints to an inmate who was kicking at his cell door. While the officers applied restraints, one officer placed a knee on the inmate's head; photos taken of the inmate after the incident showed blood flowing from the inmate's ear.[7] This one incident, standing alone, does not demonstrate that Greenville County was deliberately indifferent to the constitutional right of inmates to be free from excessive force by inadequately training its officers to handle multiple-officer takedowns. Indeed, the GCDC's internal investigation of the incident on February 10 belies any assertion of deliberate indifference on the part of Greenville County in regard to its training programs and the injuries that any alleged deficiencies in that pro-

_____

house of cards, the evidence for positional asphyxia has fallen completely"). On appeal, Sims does not contest the district court's conclusion that the medical evidence did not support the assertion that positional asphyxiation was the cause of death; she only mentions compression asphyxiation as the cause of death in her brief. Thus, she does not argue, as she did below, that Greenville County was deliberately indifferent to an obvious risk of injury to inmates in that it failed to train its officers on the potential dangers of positional asphyxiation presented by hog-tying.

[7] This incident is discussed in a report prepared by a private consultant named Steve Martin who assisted the United States Justice Department in its investigation of conditions at the GCDC following the Radcliff incident. The Martin report offers high praise for the GCDC in some respects, but criticizes its detention officers for sometimes using excessive force in the restraint of inmates. The report, however, lists only one incident involving injury resulting from a multiple-officer takedown prior to Radcliff's death: the February 10, 1997, incident described above. Sims also points to a letter to Greenville County from Bill Lann Lee, Acting Assistant Attorney General in the Civil Rights Division of the Justice Department, in which Lee mentions the incident of February 10. Sims complains that the district court erred in concluding that the Martin report and the Lee letter were untrustworthy and therefore inadmissible hearsay because they were prepared with litigation in mind against Greenville County under the Civil Rights of Institutionalized Persons Act. We note, however, that the district court, despite its evidentiary ruling, expressly considered the contents of both documents in deciding to grant summary judgment to Greenville County.

8

gram might cause. This investigation's report stated that placement of the knee on the inmate's head was not an approved technique. This one incident, rather than alerting Greenville County to an alleged inadequacy in its training program that failed to aid detention officers in confronting a recurring situation and was therefore likely to result in a violation of the constitutional right to be free from excessive force, simply indicated that an officer had not obeyed a training directive that specifically addressed the situation with which he was confronted. Greenville County specifically trained its detention officers how to take an inmate to the floor while using the least amount of force necessary and to avoid placing a knee on the inmate's neck or back while applying restraints so as to avoid causing asphyxiation. Because it was not obvious that Greenville County's "failure" to supplement its training by conducting group exercises might cause the use of excessive force against an inmate, Greenville County was not deliberately indifferent to Radcliff's constitutional rights.

In any event, Sims has failed to present any evidence that the injury to Radcliff could have been avoided had the alleged deficiency in the training program been corrected. As noted above, the training program under which the officers involved in the Radcliff incident operated specifically instructed them on the need to use minimal force and to avoid placing a knee on an inmate's neck or back. See Harris, 489 U.S. at 391 ("[P]lainly, adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the basis for holding the city liable."). We simply cannot, applying the "rigorous standards of culpability and causation" that we must in this situation, say that the alleged deficiency in the training program of failing to conduct group exercises "ma[de] the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run." Carter, 164 F.3d at 218 (4th Cir. 1999) (internal quotation marks omitted). Thus, we agree with the district court that Sims has failed to show the existence of an unconstitutional policy that caused Radcliff to be subjected to excessive force.**8**

_____

**8** In her brief, Sims appears to make the claim, independent of her "failure to train" claim, that Greenville County had a custom of allowing its officers to use excessive force on inmates in restraining them. Although Sims raised this claim below, she fails to develop her argument on this

9

B.

Sims also claims that the district court erred in granting summary judgment to Greenville County on her state law claim, brought pursuant to the South Carolina Tort Claims Act, that the County trained its detention officers in a grossly negligent fashion. The district court concluded that she failed to present evidence of gross negligence. Although the SCTCA is a limited waiver of governmental immunity,

_____

issue here, stating only that the same facts and arguments regarding her "failure to train" claim apply to her custom-of-excessive-force claim as well. Having rejected her arguments in the first context, we necessarily reject them in the second. After all, we will not find a municipal custom if all the plaintiff can assert is a "meager history of isolated incidents [that does not] approach the widespread and permanent practice necessary to establish municipal custom." Carter v. Morris, 164 F.3d 215, 220 (4th Cir. 1999) (internal quotation marks omitted). The February 10 incident, the single incident before Radcliff's death to which Sims can point in which an inmate was injured by what was arguably the use of excessive force during a multiple-officer takedown, is simply not a sufficient history of a widespread and permanent practice that could establish a municipal custom.

Sims also argues that Greenville County, in an admission filed with the district court, conceded that it had a policy or custom of allowing its detention officers to use excessive force on detainees. Our review of the admission indicates otherwise: the County, consistent with its position that Sims's portrayal of the Radcliff incident is inaccurate and that its detention officers did not use excessive force against Radcliff, simply stated that the actions of the officers during the Radcliff incident "were in compliance with the customs, policies, practices, and procedures of Greenville County." (J.A. at 618 (emphasis added).) This statement, taken in proper context, cannot be fairly read as a concession that those customs, policies, practices, and procedures tolerated the use of excessive force.

Finally, Sims raises, for the first time on appeal, the argument that Greenville County's use-of-force policy was unconstitutional both on its face and as applied. Because Sims failed to raise this argument below, we will not consider it. See Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993) (holding that "issues raised for the first time on appeal generally will not be considered").

10

it contains a list of exceptions to the grant of that immunity. The relevant exception reads as follows:

> The governmental entity is not liable for a loss resulting from:
>
> . . .
>
> (25) responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, except where the responsibility or duty is exercised in a grossly negligent manner.

S.C. Code Ann. § 15-78-60(25) (Law. Co-op. Supp. 1998). South Carolina courts have defined gross negligence as "the intentional, conscious failure to do something which one ought to do or the doing of something one ought not to do." Etheredge v. Richland Sch. Dist. I, 499 S.E.2d 238, 242 (S.C. Ct. App. 1998) (citing a long list of cases employing that definition). We believe that the district court did not err in holding that the County met its burden of showing that this exception applies to this case[9] by providing uncontradicted evidence that it provided a training program for its detention officers that actually exceeded the training requirements imposed by the state. Moreover, as our discussion in Part II.A of this opinion makes clear, Sims failed to present any evidence that Greenville County intentionally and consciously provided an allegedly inadequate training program to its officers that was bound to result in the use of excessive force during multiple-officer takedowns.[10]

_____

[9] "The burden of establishing a limitation upon liablility or an exception to the waiver of immunity is upon the governmental entity asserting it as an affirmative defense." Etheredge v. Richland Sch. Dist. I, 499 S.E.2d 238, 242 (S.C. Ct. App. 1998).

[10] Sims also asserts, for the first time on appeal, that, regardless of its training program, Greenville County is vicariously liable under the SCTCA for the actions of its detention officers. Because Sims did not make this allegation in her complaint or present such an argument below, we will not consider it. See Muth v. United States, 1 F.3d 246, 250 (4th Cir. 1993) (holding that "issues raised for the first time on appeal generally will not be considered.").

11

III.

For the foregoing reasons, the district court's order granting summary judgment to Greenville County on Sims's claims under 42 U.S.C.A. § 1983 (West Supp. 1999) and the SCTCA is affirmed.

AFFIRMED